# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| MAURICE L. KING, SR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE: 2:03-CV-126-PRC |
| | ) | |
| ALBERTO R. GONZALEZ, Attorney | ) | |
| General of the United States,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment [DE 28], filed by the

Defendant, Alberto R. Gonzalez, Attorney General of the United States, on December 15, 2004.  For

the following reasons, Defendant Gonzalez's Motion for Summary Judgment is granted.

## PROCEDURAL BACKGROUND

On April 4, 2003, the Plaintiff, Maurice L. King, Sr., filed a Complaint in this Court, alleging

race discrimination and retaliation under Title VII, 42 U.S.C. §§ 2000e, *et seq*.  On December 5,

2003, the Defendant filed his Answer.

On December 15, 2004, the Defendant filed his Motion for Summary Judgment and

supporting materials.  On January 25, 2005, the Plaintiff filed his Answering Memorandum to

Defendant's Motion for Summary Judgment and supporting materials.  On February 11, 2005, the

Defendant filed his Reply.

---

[1] Alberto Gonzalez succeeded John Ashcroft as Attorney Genereal of the United States and is substituted as the Defendant in this case pursuant to Rule 25(b) of the Federal Rules of Civil Procedure.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the

district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.  When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990).  However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists.  *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings.  Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994).  Rule 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party.  *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).  A court's role is not to evaluate the weight

3

of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

No heightened standard of summary judgment exists in employment discrimination cases nor is there a separate rule of civil procedure governing summary judgment in employment cases. *Alexander v. Wisconsin Dept. of Health and Family Srvcs.*, 263 F.3d 673, 681 (7th Cir. 2001) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997)). However, intent and credibility are critical issues, frequently found in employment cases, that are genuinely contestable. *Id*. Nevertheless, summary judgment in favor of the defendant is hardly unknown or rare in employment discrimination cases. *Wallace*, 103 F.3d at 1396.

## FACTUAL BACKGROUND

Maurice L. King, Sr. ("King") is an African American who was employed as a Criminal Investigator/Special Agent by the Drug Enforcement Administration ("DEA") from October 1991 until September 6, 2002. During all times relevant to King's claims in this action, King worked as a Special Agent in the Merrillville Resident Office ("MRO") in Merrillville, Indiana, which is part of the Chicago Field Division. King's supervisory chain, as it pertains to this case, from highest to lowest level supervisor, was: (a) Donald Sturn, Special Agent in Charge; (b) William Segarra, Associate Special Agent in Charge; (c) Irvin Lightcap, Assistant Special Agent in Charge; (d) Michael Flanagan, Resident Agent in Charge; and (e) Alex Rodriguez, Group Supervisor. At the time of the events in this case, Sturn and Segarra had offices in Chicago, Illinois; Lightcap's office was in Indianapolis, Indiana; and Flanagan and Rodriguez had offices in Merrillville, Indiana.

4

### A.  King's Employment with the DEA

King received a performance evaluation for the first six months of 1999.  This evaluation was done by former Resident Agent in Charge, Steve Bissenger, who rated King's performance as "excellent."  Bissenger's "excellent" rating was one performance level below the highest available rating of "outstanding."  After King was evaluated by Bissenger, but before he was evaluated by Rodriguez, the DEA reduced the number of performance categories used for an agent's performance evaluations from five categories to four categories.  In January of 2000, Rodriguez met with King to discuss King's performance evaluation for the last six months of 1999.  During the evaluation, Rodriguez rated King's performance as "significantly exceeds."  Due to the reduction in the number of performance categories used in evaluations, Rodriguez's "significantly exceeds" rating was also one performance level below the highest available rating of "outstanding."

After his evaluation with Rodriguez, King heard that Special Agent Mark Keller received an "outstanding" rating on his evaluation for the last six months of 1999.  Thereafter, on March 21, 2000, King filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination on the part of his employer, the Drug Enforcement Agency ("DEA").  King's charge alleged that Rodriguez and Flanagan racially discriminated against him with respect to his evaluation for the last six months of 1999 because another employee, Keller, was given a higher evaluation than King.  Before filing his charge with the EEOC, King contacted an EEO counselor and went through an informal process to attempt to resolve his claims.

King believes that his performance was better than Keller's because Keller made mistakes on the job during the last six months of 1999.  However, King testified that he also made mistakes on the job during that same period and that Rodriguez was aware of those mistakes.  In addition, as

of January 2000, Keller was the most senior Special Agent at the MRO and served as Rodriguez's backup supervisor during the last six months of 1999.  As backup supervisor, Keller had more responsibilities than other Special Agents.  These additional responsibilities included supervising the agents in the MRO when Rodriguez was absent, dealing with any problems that arose, ensuring that employees were on task, and ensuring that employees met DEA standards.  Before Keller was offered the backup supervisor position, Rodriguez had asked King to serve as his backup on several occasions. However, each time Rodriguez asked, King declined the backup supervisor position. Indeed, King told Rodriguez and Flanagan that he did not want to be a supervisor.

King testified that before he filed his EEO charge in March of 2000, Rodriguez told King that he would talk to a contact about getting King into a training class in Quantico, Virginia.   After King filed his charge in March of 2000, Special Agent John Spangenberg went to the training class. King never asked why he did not get to go to the class, never complained to anyone about the matter, does not know why Spangenberg was allowed to go to the class, and does not know whether the class was particularly useful.  Rodriguez never gave any indication to King that he refrained from sending King to the class because King had seen a counselor or filed an EEO charge.

King contends that in late February of 2000, Rodriguez approached Hubert Davidson, a probationary DEA agent who was being trained by King, and advised Davidson to state that King was a poor Field Training Agent and should be removed.  King contends Flanagan did essentially the same thing to Davidson on or about March 6, 2000.  However, King did not hear the alleged comments by Rodriguez or Flanagan; rather, King contends that Davidson told him about them.

Sometime after late February of 2000, King wrote a memorandum to Rodriguez recommending that the DEA stop using a particular informant.  Davidson concurred with his

recommendation.  King contends that after the exchange regarding the informant, Rodriguez told Davidson that he would be "collateral damage" if he continued to support King.  King did not hear Rodriguez's alleged comment; rather, King contends that Davidson told him about it.  King remained Davidson's Field Training Agent and supervised Davidson through the completion of his probationary training period.

King contends that after Davidson completed his probationary training, Davidson refused to work with him.  King testified that before Davidson completed his training, he told King that he did not want to work with him anymore.  After Davidson completed his training, he primarily worked with Doug Radigan, a DEA agent working in South Bend, Indiana.  King testified that he never asked Davidson to work with him.

King contends that after he filed his charge of discrimination, Rodriguez supervised him more closely than other agents in the MRO by complaining about mistakes or the format of his reports; disagreeing with his decision to stop working with a particular informant; monitoring his whereabouts when he left the building; watching him while he was on the phone or computer; conducting more detailed meetings with him and his partner regarding operational plans; and questioning employees about a picture that was on his desk.

On or about April 13, 2000, King submitted a written statement to the the DEA's Office of Professional Responsibility ("OPR") which outlined suspected criminal and/or administrative violations by agents working in the MRO, including Rodriguez and Flanagan.  The DEA OPR investigates alleged criminal and administrative violations by DEA employees. If an OPR investigation reveals criminal and/or administrative violations by a DEA employee, that employee could be subject to discipline, removal, and/or criminal prosecution.

7

Eleven days after submitting his written statement, King went to DEA headquarters in Washington, D.C. and provided sworn testimony to OPR concerning his allegations. Before he left for Washington, D.C., King made it generally known throughout the MRO that he had contacted OPR and was going to provide testimony to OPR. During his testimony to OPR, King became emotional, and an OPR Inspector advised King of DEA's Employee Assistance Program.

In April of 2000, Sturn became aware that King went to the OPR's offices in Washington, D.C. to be interviewed by OPR investigators. Shortly thereafter, Sturn was provided with a copy of King's written statement to OPR containing his allegations. Sturn spoke with the Deputy Chief Inspector of OPR, William Brown, and Brown advised him that King's allegations did not appear to be credible because the allegations were vague, unclear, dated, and were principally based on innuendo and hearsay. Brown also advised Sturn that during his OPR interview, King began to weep uncontrollably and became emotionally distraught.

On May 3, 2000, Sturn visited the MRO for the first time in order to introduce himself as the new Special Agent in Charge of the Chicago Field Division and to provide the MRO personnel with his vision regarding the mission and priorities of the DEA. In addition to covering other matters, Sturn advised the MRO of a relatively new change in DEA's standards of conduct concerning DUIs and alcohol usage, emphasized the importance of reporting any violations of DEA's standards of conduct using the OPR process, and reminded the employees that it was a violation of DEA's standards of conduct to abuse the OPR process through malicious OPR reporting. King contends that during the meeting on May 3, 2000, Sturn said that "he was going to come after the person who reportedly made false and malicious statements to the OPR that would tarnish and ruin the reputation of the agency and that he was going to personally seek prosecution of the person."

On or about June 28, 2000, Sturn received a memorandum from Flanagan advising him of "the serious detrimental effect . . . malicious OPR accusations, rumors and innuendos are having on the morale" of the personnel in the MRO.  Thereafter, in a series of conversations culminating in electronic mail messages on July 3, 2000, Sturn heard that King complained at his mid-year evaluation that he felt badgered and demeaned, acted in an unprofessional manner during the evaluation, acted in a manner that frightened Jennifer Puntillo, a female receptionist/student aide in the MRO, and approached and intimidated Robert Kennedy, a DEA Special Agent in the MRO.  At Sturn's request, Puntillo and Kennedy provided statements detailing the circumstances of their interaction with King and his behavior.

On or about July 21, 2000, Sturn directed a memorandum to R.C. Gamble, the Chief Inspector of DEA.  Gamble was responsible for determining whether a DEA employee should be referred for a DEA suitability review protocol examination ("SRP exam") to assess whether the employee's psychiatric and psychological condition were such that the employee could continue to carry out his duties.  Sturn's memorandum requested that King be placed on administrative leave and undergo a SRP exam for the following reasons:  King's conflicting statements as to whether he had any OPR related issues to report; his announcement to his co-workers that he was reporting suspected violations to OPR; his reporting of serious allegations to OPR based on unsubstantiated rumors, innuendo, and hearsay; Sturn's understanding that King's OPR allegations were unfounded; King's inappropriate behavior with Puntillo and Kennedy; and King's behavior during his mid-year review.

Under DEA guidelines, as Special Agent, Sturn was the only DEA employee within the Chicago Field Division with authority to *request* a SRP exam for King.  However, under the

9

guidelines, Sturn did not have the authority to determine whether King should undergo a SRP exam, what materials would be reviewed once the SRP exam process began, or whether King should be placed on administrative leave.  Sturn did not make any of these decisions.

In a memorandum dated July 21, 2000, Gamble advised Sturn and Retha M. Fulmore, Deputy Assistant Administrator, DEA Office of Personnel, that after his review of the submitted information, Gamble concluded that King should undergo a SRP exam, as soon as possible, to determine his psychiatric and psychological condition.   Sturn then advised King in a memorandum dated August 2, 2000, that, pursuant to instructions from Gamble, he was being placed on administrative leave immediately pending a SRP exam and that King would remain in nonduty status with pay until completion of the examination.

By telephone discussion on August 8, 2000, Gamble requested more information regarding the behavioral changes in King that led to Sturn's decision to request a SRP exam for King.  The next day Sturn provided Gamble with a memorandum outlining examples of King's questionable behavior, including his exhibition of unusual performance problems, mood swings, agitated responses, loud outbursts, staring, reported comments to other agents that he was under a lot of stress, and his reported comment that management was coming after him coupled with his simultaneous request to borrow a bullet-proof vest.  After providing Gamble with the memorandum from August 9, 2000, Sturn did not have any input or involvement in decisions that were made concerning King, including any decision regarding his psychiatric condition, psychological condition, or employment status.

On August 10, 2000, Gamble advised Sturn that he had reviewed the August 9 memorandum and determined that a SRP exam for King was warranted.  That same day, Fulmore advised Sturn

10

that, "in adherence to SRP guidelines, SA King is being placed on administrative leave, effective immediately.  Administrative leave will continue for SA King until a decision is reached relevant to his suitability to perform the full range of duties of a Special Agent."  Sturn was also directed to provide, and subsequently provided, King with a copy of the memorandum from Fulmore dated August 10, 2000.

Approximately one month later, Fulmore advised Sturn of the arrangements for King's SRP exam and directed him to provide King with a copy of Fulmore's letter to King which detailed these arrangements and ordered King to report for the SRP exam.  King signed for Fulmore's letter on or about September 11, 2000.

Dr. Judith Lichtenstein performed a psychiatric examination of King on September 19, 2000, and Dr. Eric Ostrov performed a psychological examination of King on September 19 and 20, 2000. King provided Drs. Lichtenstein and Ostrov with information that he thought they needed to perform their evaluations, including information concerning himself and his EEO claims.  During his deposition, King testified that after his psychiatric and psychological evaluations were completed, the doctors made a finding of "rule out delusional disorder" and recommended that King undergo mental health treatment.

Thereafter, King received a letter from Fulmore, dated January 22, 2001, which proposed King's indefinite suspension based on his unavailability for work due to his medical condition as determined by Drs. Lichtenstein and Ostrov.   The letter provided that in lieu of being placed on indefinite suspension, King could enter into a medical Treatment Agreement of his choosing to allow King to obtain the appropriate medical treatment while in a leave status.  If King chose the Treatment Agreement, he would remain in a pay status as long as possible while being treated for

his medical condition.  The letter also advised him of the consequences of not entering the Treatment Agreement.  In addition, the letter advised King that if the indefinite suspension became effective, the suspension would end if King provided a written statement and appropriate records from his treating physician(s) indicating he is able to perform the full range of duties of a DEA Special Agent and that information was verified and confirmed by DEA or if King offered to formally enter into the DEA Treatment Agreement and King's offer was accepted by the appropriate DEA management official(s).   King declined to take advantage of the medical Treatment Agreement option. Accordingly, King was placed on indefinite suspension, non-duty status without pay, effective March 2, 2001.

On February 12, 2002, King underwent a psychological examination with Dr. Eric Ostrov, and on February 13, 2002, King underwent a psychological examination with Dr. Linda Gruenberg. King testified that he provided both doctors with the information that he thought they needed to perform their evaluations, including information concerning himself and his EEO claims. Thereafter, on or about June 3, 2002, DEA proposed to remove King from his position as Criminal Investigator/Special Agent due to King's unavailability to work due to King's medical condition as determined by Drs. Ostrov and Gruenberg.   In lieu of removal, King was again offered the option of entering into a medical Treatment Agreement.  However, King declined to take advantage of the medical Treatment Agreement option.  Accordingly, on or about September 6, 2002, King was removed from his position as a DEA Criminal Investigator/Special Agent based on the charge of unavailability to work due to King's medical condition.  King never consulted his own personal physician or provided DEA with any medical documentation indicating that he was able to perform the full range of his duties as a Special Agent.

### B.  King's Subsequent EEO Activity

King testified that the SRP examination process and his subsequent suspension and removal were not included in his initial formal EEO complaint as alleged acts of retaliation.  Rather, King testified that these employment actions were new acts of retaliation for which he first attempted to begin the EEO process on or about March 30, 2001.

According to King, he attempted to  file another charge with the EEOC alleging retaliation for filing his initial EEO charge in March of 2000.  King tried to file the charge with the Office of Inspector General ("OIG") in order to avoid conflicts with his employer, the DEA.   The OIG did not accept King's complaint.  Rather, the package was received in the DOJ mail room and referred to DEA.  On July 25, 2001, King received a letter from Ellen Harrison, a Senior Attorney in the DEA, which advised King that:

> To initiate an EEO complaint, you must contact an EEO counselor.  If the matter is not resolved at that stage, you may file a formal written complaint.  DOJ has developed procedures by which EEO complaints can be referred for investigation to DOJ components other than the employing component.  Thus, if an EEO complaint by a DEA employee needed to be investigated outside DEA, the DOJ EEO Officer can assign it for investigation to another DOJ component, such as the Marshals Service or the FBI.

The letter also encouraged King to contact the DEA's EEO Officer, Ms. Barbara Lewis, but if King was not willing to contact Lewis or her staff, King should contact the Department of Justice ("DOJ") EEO Officer, Ted McBurrows, as soon as possible.

After receiving Harrison's letter, King wrote a letter to Ted McBurrows, the DOJ EEO Officer, on July 28, 2001, with the request to file an EEO complaint of "discrimination reprisal/retaliation."  Hearing nothing from McBurrows or his staff, King wrote another letter dated October 10, 2001.  On October 24, 2001,  McBurrows wrote to King and explained that in

accordance with the DOJ's internal regulations, a complaint is processed by the bureau in which the complaint arose.  McBurrows provided King with the contact information for Barbara Lewis.  McBurrows also noted that it was his understanding that the OIG does not process complaints of discrimination.  McBurrows further explained that a bureau only forwards to the Director of EEO Staff those cases that pose a real or perceived conflict of interest.   McBurrows advised King that he needed to address his conflict of interest issue with Barbara Lewis.

On December 14, 2001, Lewis wrote King to advise that she received a copy of correspondence and attachments, dated November 5, 2001, which were sent from King to McBurrows.  Lewis advised King that she could not discern from the previous letters and attachments sent to McBurrows either the basis for King's complaint or his request for an outside investigation.  She requested that he "provide this office with [his] justification to warrant [her] referring [his] complaint to Mr. McBurrows' office for administrative processing by another component of the Department of Justice."  She also advised him that upon receipt and review of his justification, she would, if appropriate, promptly refer his complaint to the Department of Justice.

On December 29, 2001, King again sent a letter to McBurrows, with a copy to Lewis, asking about the OIG and if that agency processes or investigates complaints of discrimination made outside of the OIG.  King did not respond to Lewis' letter of December 14, 2001.

On January 31, 2002, Lewis wrote King and advised him that, in accordance with the EEOC regulations, he must contact an EEO counselor before filing an initial complaint.  She provided the names and numbers of the EEO counselors for the Chicago DEA Division.  In Plaintiff's Answering Memorandum, King alleges that he attempted to contact an EEO counselor on February 8, 2002.

However, King has not presented any admissible evidence in support of this claim.[2]  Furthermore, in his deposition, King stated that by the time he attempted to contact a DEA EEO counselor regarding his retaliation claims, he had already filed the instant Complaint.  *See Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999) ("It is a well-settled rule of this Court that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition . . . . Thus, when a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit.")

On September 9, 2002, King sent a letter to Eric Williams, a DEA EEO Counselor, asking to include his September 6, 2002, termination as part of his retaliation claim.  King never asked for a meeting to discuss his retaliation claim and he did not file a subsequent charge with the EEOC. On September 23, 2002, King wrote Lewis and requested a final decision on his EEO claims within ten days.  He advised Lewis that if he did not receive a decision within ten days, he would contact the EEOC Chicago District office and seek sanctions.  The same day, King also wrote the Chicago EEOC Hearings Unit asking for a final decision within ten days on both his discrimination and retaliation claims.

On January 8, 2003, King received a final notice regarding the initial discrimination charge filed on March 21, 2000.  King's claim was denied.  On March 2, 2003, King wrote both the EEOC Complaint Adjudication Office and Lewis, requesting a decision on his retaliation claims.  On April

---

[2]  Although the Plaintiff's Answering Memorandum refers to an Exhibit J, no Exhibit J was attached to the Plaintiff's Answering Memorandum.  In another instance, King's assertion that he "attempted to contact an EEO counselor regarding his reprisal claims on December 29, 2001," is not supported by the referenced exhibit.  *See Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)(hearsay testimony should not be considered at summary judgment stage); *Whitted v. GMC*, 58 F.3d 1200, 1204 (7th Cir. 1995)(materials submitted in opposition to summary judgment must be admissible as evidence)

4, 2003, the instant complaint was filed in the Northern District of Indiana.

## DISCUSSION

In his Motion for Summary Judgment, the Defendant argues that summary judgment is appropriate because King has (1) failed to exhaust his administrative remedies on the retaliation claims, and (2) failed to sustain his burden of proof with respect to his race discrimination or retaliation claims.   In King's Answering Memorandum, he argues that his claims for discrimination and retaliation were timely and that he has exhausted his administrative remedies on both his discrimination and retaliation claims.   He also argues that he was discriminated and retaliated against by his supervisors based solely on his race.   Specifically, he asserts that his evaluation in early 2000 was an act of discrimination because a special agent of another race was given a higher evaluation.   Additionally, King also claims that being ordered to undergo the SRP exam in September 2000, being placed on indefinite suspension without pay in March 2001, and his termination as a Criminal Investigator/Special Agent on September 6, 2002, were all acts of retaliation taken because he filed a charge with the EEOC.

### A.  The Standards

*1. Exhaustion of Administrative Remedies Requirement*

EEO regulations relating to federal sector equal employment opportunities require that all "[a]ggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."  29 C.F.R. § 1614.105(a).  "An aggrieved person

must initiate contact with a Counselor within 45-days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45-days of the effective date of the action." 29 C.F.R. § 1614.105(a)(1).

In the Seventh Circuit, the requirement that an aggrieved person contact an EEO counselor within forty-five days is not jurisdictional, but rather is construed as a statute of limitations. The forty-five day period may be extended when the plaintiff shows that: (1) he or she was not notified of the time limits and was not otherwise aware of them; (2) he or she did not know and reasonably should not have known that the discriminatory matter or personnel action occurred; (3) despite due diligence he or she was prevented by circumstances beyond his or her control from timely contacting an EEO Officer within the time limits; or (4) the deadline should be extended for other reasons the agency deems sufficient. 29 C.F.R. § 1614.105(a)(2); *Johnson v. Runyon*, 47 F.3d 911, 917 (7th Cir. 1995); *Hira v. Runyon*, 1999 WL 104157 (N.D. Ill. 1999). The individual asking for an extension has the burden of showing that an extension is warranted. *McSwain v. Runyon*, 990 F. Supp. 1001, 1003 (N.D. Ill. 1998).

In addition, in order to proceed under Title VII in a district court, a plaintiff must first complete a review of his allegations before the EEOC. *Holloway v. Bentsen*, 870 F.Supp. 898, 902 (N.D. Ind. 1994). If a plaintiff fails to exhaust the administrative remedies, such claims must be dismissed. *Hill v. Potter*, 352 F.3d 1142, 1135-46 (7th Cir. 2003)("Title VII does not authorize the filing of suit until the plaintiff has exhausted his administrative remedies, 42 U.S.C § 2000e-16(c), which means not until he has received a right-to-sue letter from the EEOC . . . . If plaintiffs could sue before then, the time of the courts and of lawyers would be wasted with cases that ended up being resolved or abandoned at the administrative level."). "Exhaustion of administrative remedies,

17

while not jurisdictional, is prerequisite to bringing suit in district court." *Holloway*, 870 F.Supp. at

902-3 *(*citing *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).  The

scope of a plaintiff's Title VII action in the district court is limited to the claims that were presented

to the EEOC.  *See Kulumani v. Blue Cross Blue Shield Association*, 224 F.3d 681, 685 (7th Cir.

2000); 42 U.S.C. § 2000e-5(e)(1).  This filing prerequisite serves the dual purpose of affording the

EEOC and the employer an opportunity to settle disputes through conference, conciliation, and

persuasion and of giving the employer some warning of the conduct about which the employee is

aggrieved.  *Cheek*, 31 F.3d at 500.  Therefore, "allowing a complaint to encompass allegations

outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and

conciliatory role, as well as deprive the charged party of notice of the charge." *Id.* (citing *Rush v.*

*McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992)); *see also Babrocky*, 773 F.2d at 863.


*2.  Legal Standards for Discrimination and Retaliation*

Title VII of the Civil Rights Act of 1964 provides in part:

It shall be an unlawful employment practice for an employer–(1) to fail or refuse to
hire or to discharge any individual, or otherwise to discriminate against any
individual with respect to his compensation, terms, conditions or privileges of
employment, because of such individual's race, color, religion, sex, or national
origin.

42 U.S.C. § 2000e-2(a).  To be actionable, the offensive conduct must be based on one of the

characteristics protected by Title VII, such as race.  42 U.S.C. § 2000e-2(a)(1).

A plaintiff in an employment discrimination case may prove discrimination through either

direct or indirect evidence.  *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Prot.*, 344

F.3d 680, 689 (7th Cir. 2003).  Regardless of the method, the burden is on the plaintiff to

demonstrate that genuine issues exist for trial. *Markel v. Bd. of Regents of the Univ. of Wisc. Sys.*, 276 F.3d 906, 910 (7th Cir. 2002). The direct method can be based on either direct or circumstantial evidence. *Volovsek*, 344 F.3d at 689. Direct evidence is evidence which, "if believed by the finder of fact, will prove the particular fact in question without reliance upon inference or presumption." *Id*. at 689 (internal quotation marks omitted) (citing *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)). Circumstantial evidence can be "(1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently, or (3) evidence that the employee was qualified for the promotion and passed over and the employer's reason for the difference in treatment is a pretext for discrimination." *Id*. at 689-90.

King presents no direct evidence of race discrimination or retaliation by the Defendant, so the Court will analyze his claims based on indirect evidence under the familiar burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under the indirect method set forth in *McDonnell Douglas*, King must first establish a prima facie case of discrimination and retaliation. The prima facie case for race discrimination under Title VII and retaliation under Title VII are similar. Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of race discrimination by showing that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of his discharge, he was meeting his employer's legitimate work expectations; and (4) he was treated less favorably than similarly situated employees outside of his protected class. *McDonnell Douglas*, 411 U.S. at 802; *Peters v. Renaissance Hotels Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002); *Bratton v. Roadway Package Sys. Inc.*, 77 F.3d 168, 176 (7th Cir. 1996). Similarly, to establish a prima facie case of retaliation,

a plaintiff must show that (1) she lodged a complaint of discrimination, (2) she was performing her job in a satisfactory manner, (3) she was subjected to an adverse employment action, and (4) only she, and not an otherwise similarly situated employee who did not complain, was subject to the adverse employment action. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003) (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). In *Stone*, the Seventh Circuit clarified that to establish a prima facie case of retaliation under the *McDonnell Douglas* analysis, an employee need not present proof of a "'causal link' between the protected expression in which the plaintiff engaged (as by filing a complaint about an unlawful act by his employer) and the adverse employment action of which he is complaining." *Johnson,* 325 F.3d at 897. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 897 (7th Cir. 2003).

If King fails to establish even a single prong of the prima facie case for race discrimination and retaliation, his claim cannot survive summary judgment. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). However, if King establishes the prima facie case for discrimination or retaliation, an inference of discrimination exists, and the burden of production shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802-03 (1973); *Haywood, 323 F.3d at 531; Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002) (citing *Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 629 (7th Cir. 1996)). Once the Defendant provides a legitimate explanation, the inference of discrimination evaporates and the burden shifts back to King to prove that the proffered justification is pretextual. *Millbrook*, 280 F.3d at 1174; *Haywood*, 323 F.3d at 531.

To establish pretext, King must prove, by a preponderance of the evidence, either that the Defendant was motivated by a discriminatory reason or that the Defendant's proffered reason is

unworthy of credence, in other words, a lie. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003); *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000)).  A plaintiff can establish pretext by demonstrating that (i) the proffered reason has no basis in fact, (ii) the proffered reason did not actually motivate the adverse employment action, or (iii) the proffered reason is insufficient to motivate the adverse employment action.  *Velasco v. Illinois Dept. of Human Serv.*, 246 F.3d 1010. 1017 (7th Cir. 2001); *Cliff v. Board of School Comm'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 412 (7th Cir. 1994).


## B.  The Claims

*1.  The Plaintiff's Race Discrimination Claim*

King followed the proper procedures and exhausted all of the administrative remedies, as required by both 29 C.F.R. § 1614.105 and  42 U.S.C. § 2000e-16(c), for his race discrimination claim.  King properly initiated contact with an EEO counselor within the forty-five day time period and received a final decision on his EEO claim of discrimination on January 8, 2003.  Moreover, King properly filed his claim in the Northern District of Indiana within the correct time frame. Therefore, the Court will consider the merits of King's race discrimination claim.

King has not come forward with any admissible direct evidence of racial animus to support his claim of discrimination.  In reviewing the admissible evidence in this case, there were no concessions by the Defendant or its employees that the evaluation was motivated by race and there were no remarks or actions that demonstrated a racial bias on the part of the Defendant. Furthermore, while the direct method can also be based on circumstantial evidence, King has not

come forward with sufficient circumstantial evidence on his discrimination claim to permit a rational trier of fact to find direct discrimination.  In King's Answering Memorandum, his counsel only defends King's exhaustion of administrative remedies and his retaliation claim; however, he does not attempt to analyze King's discrimination claim under either the direct method or the indirect method.  Although summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of the events and is the proper time to make a showing that a genuine issue exists that might affect the outcome of the suit, King has failed to address the race discrimination claim under either method.  Nonetheless, the Court will still address the race discrimination claim under the indirect method.

King satisfies the first prong of the prima facie case for race discrimination.  King is an African American and is, therefore, a member of a protected class.  The second prong, whether he was meeting his legitimate expectations, is also satisfied given his evaluations of "excellent" and "significantly exceeds."  For the third prong King alleges that he suffered an adverse employment action when he was given a "significantly exceeds" evaluation, which was a lower evaluation than Special Agent Keller, a Caucasian co-worker, who received an "outstanding."  King claims that this lower evaluation constitutes racial discrimination and an adverse employment action.

An "adverse employment action" involves a significant change in employment status such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).  An adverse employment action is one that significantly alters the terms and conditions of the employee's job.  *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004).  "[N]ot everything that makes an employee unhappy is an adverse action." *Smart v. Ball State Univ.*, 89

F.3d 437, 441 (7th Cir. 1996). A materially adverse employment action must be:

> . . . more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996). Allegations of generalized racial discrimination against others do not satisfy this requirement; a plaintiff must demonstrate that he or she has suffered a specific materially adverse employment action. *See, e.g., Grayson v. O'Neill*, 308 F.3d 808, 816-817 (7th Cir. 2002).

The Seventh Circuit for the United States Court of Appeals recently upheld a trial court's grant of summary judgment in *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498 (7th Cir. 2004). The Seventh Circuit rejected the plaintiff's claim that she had suffered the necessary materially adverse employment action for a Title VII claim:

> For purposes of Title VII, an adverse employment action is a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits . . . . Here, it is important to initially emphasize the undisputed evidence that Rhodes voluntarily decided to quit her job after being marked absent once. Rhodes does not allege any significant changes in her employment status, nor does she allege that she suffered a substantial change in benefits. Instead, her allegations of sex discrimination amount to: 1) having to wash her truck in cold weather; 2) being assigned to the Yard instead of a road crew for three days in April of 1999; 3) having to drive a truck without heat for a few days; 4) being prohibited from driving or riding in the foreman's truck; 5) the change in her route; and 6) being marked absent on her last day of work allegedly contrary to company policy . . . . Rhodes' allegations, if true, constitute mere temporary inconveniences and do not rise to the level of an adverse employment action. Not everything that makes an employee unhappy qualifies as an adverse action for Title VII, and this is particularly true since Rhodes primarily complains of assignments or tasks consistent with the job duties of a winter highway maintenance worker . . . . Rhodes' allegation that she was marked absent without pay does not qualify as a disciplinary suspension because this single absence had only a negligible impact on her income, and did not cause her material harm.

Rhodes, 359 F.3d at 504-505 (internal citations omitted).

A similar result was reached in *Griffin v. Potter*, 356 F.3d 824 (7th Cir. 2004).  In *Griffin*, a former postal employee claimed that she had been discriminated against because of her age.  The court in *Griffin* rejected the notion that the alleged hostility of the plaintiff's supervisor toward her, which manifested in the form of negative comments about her, was so severe or pervasive as to qualify as an actual adverse employment action.  *Griffin*, 356 F.3d at 828-830.

The Seventh Circuit again affirmed summary judgment in favor of the employer in *Traylor v. Brown*, 295 F.3d 783 (7th Cir. 2002).  The plaintiff in *Traylor* contended that her employer's refusal to allow her to perform clerical and blacksmith duties constituted an adverse employment action.  The court in *Traylor* rejected this notion, stating that:

> [w]hile Traylor is clearly unhappy with IDOT's refusal to allow her to perform the requested duties, she was not terminated, demoted or disciplined.  Furthermore, her pay was unaffected and her job responsibilities were not materially diminished.  The employees who performed these extra duties  received no promotions, higher pay or prestigious titles for doing so.  In short, the failure to assign Traylor these extra duties may have been distressing to her, but did not cause her material harm . . . .  Thus, we agree with the district court that Traylor suffered no adverse employment action and therefore is unable to establish a *prima facie* case of race or sex discrimination.

*Traylor*, 295 F.3d at 789.

Oral and written reprimands were specifically rejected as a basis for finding an adverse employment action in *Oest v. Illinois Department of Corrections*, 240 F.3d 605 (7th Cir. 2001).  In *Oest*, a corrections officer contended that several oral and written reprimands which she had received were each actionable under Title VII.  The Seventh Circuit affirmed the trial court's entry of summary judgment in favor of the employer, specifically rejecting the plaintiff's contention that the oral or written reprimands which the plaintiff had received could be considered as adverse

employment actions.  *Oest*, 240 F.3d at 613; *accord Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998).[3]  The court in *Oest* also rejected the plaintiff's contention that her unfavorable performance evaluations were adverse employment actions.  *Oest*, 240 F.3d at 613; *see also Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002); *Speer v. Rand-McNally & Company*, 123 F.3d 658, 664 (7th Cir. 1997); *Rabinovitz v. Pena*, 89 F.3d 482, 488-489 (7th Cir. 1996); *Smart v. Ball State University*, 89 F.3d 437, 441-442 (7th Cir. 1996).

King has failed to carry his burden to establish that the "significantly exceeds" evaluation demonstrates an adverse action.  As set forth, a material adverse action is one in which there is a change in the terms and conditions of employment, which is more than a mere inconvenience or alteration of job responsibilities.  In this case, King has not shown that he suffered any readily quantifiable loss due to his lower evaluation.  The lower evaluation did not result in discipline or a change in title.  Moreover, the lower evaluation did not alter or change King's responsibilities, salary, or benefits.  Therefore, King has failed to establish that the lower evaluation is an adverse action and fails to establish the necessary third prong of the analysis.

Under the indirect, burden-shifting method of proving discrimination under Title VII, King has not successfully established his claim of race discrimination because he failed to establish the third prong necessary to demonstrate a prima facie case of race discrimination.  Based on the foregoing, summary judgment is appropriate on King's race discrimination claim.

---

[3] "Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them."  Sweeney, 149 F.3d at 556.  Even a reassignment or transfer from one position to another, without some significant change in salary or benefits, has been rejected as a basis for finding an adverse job action.  *See Crady v. Liberty National Bank and Trust Company of Indiana*, 993 F.2d 132, 134-36 (7th Cir. 1993); *Spring v. Sheboygan Area School District*, 865 F.2d 883, 885-86 (7th Cir. 1989).

*2. The Plaintiff's Retaliation/Reprisal Claims*

King argues that he suffered several incidents of retaliation, namely, (1) having to undergo an SRP exam on September 18 and 19, 2000, (2) placement on indefinite suspension on March 2, 2001, and (3) termination from employment on September 6, 2002.[4]   Each of these alleged incidents of retaliation took place after King properly filed his initial March 2000 discrimination claim.  Thus, when King properly filed his initial EEO charge, the SRP exam, his suspension, and his termination were not included within that charge.

With respect to King's first allegation of retaliation, having to submit to a SRP exam on September 18 and 19, 2000, even if King properly initiated the EEO process with an EEO Counselor in March of 2001, either by phone conversations, letters, or personal contact, King failed to meet the forty-five day deadline.  King had until November 4, 2000, to seek EEO counseling.  However, King failed to meet the forty-five day requirement because he failed to initiate counseling in a timely manner.  Based on King's conduct in filing his initial charge, he was aware of the proper procedures in which to initiate a claim.[5]   Moreover, as set forth in the Factual Background, King was advised several times between July 2001 and January 2002 of the procedures he needed to follow.  Given King's prior knowledge and experience on how to properly initiate a claim, he has not met his

---

[4]   The order to undergo an SRP examination, his suspension, and his removal are each discrete acts and each act started a "new clock" for filing charges alleging that act was retaliatory.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period.").  King was ordered to undergo an SRP examination on August 2, 2000, was later suspended indefinitely effective March 2, 2001, and was eventually terminated on September 6, 2002.

[5]   In the Plaintiff's Answering Memorandum, the Plaintiff does not argue that he was not notified of the time limits or was not aware of the filing requirements.

burden of demonstrating why an extension should be granted with respect to contacting a counselor about his SRP examination.

King's second claim of retaliation is based on his suspension on March 2, 2001. King should have contacted an EEO counselor by April 16, 2001, to comply with the time requirement, or King must demonstrate that he is entitled to an extension. The facts on record demonstrate that King attempted to resolve these claims outside of the DEA because he perceived a conflict of interest. However, the material facts on record establish that the unnecessary circle of letters and phone calls could have been avoided if King would have followed the proper procedures which were *known* by him. On July 25, 2001, King was advised in a letter from Ellen Harrison, Senior Attorney for the DEA, that:

> *To initiate an EEO complaint, you must contact an EEO counselor.* If the matter is not resolved at that stage, you may file a formal written complaint. DOJ has developed procedures by which EEO complaints can be referred for investigation to DOJ components other than the employing component. Thus, if an EEO complaint by a DEA employee needed to be investigated outside DEA, the DOJ EEO Officer can assign it for investigation to another DOJ component, such as the Marshals Service or the FBI.

(emphasis added). Additionally, the letter warned that "[t]he anti-discrimination laws provide strict time frames in which to file EEO complaints." *Id.* This letter provides King with both warning and notice about following the procedural requirements necessary to bring such a claim. Even if King did not know how to initiate a claim, after he received this letter, he would have known exactly what to do and he would have had until September 8, 2001, to start the proper process. However, even if the Court excepts King's unsupported allegation that he contacted an EEO counselor on February 8, 2002, this was not until nearly seven months after receiving the letter from Ellen Harrison.

Although King attempted to initiate his claim outside the DEA by contacting Ted

27

McBurrows, a response letter from McBurrows dated October 24, 2001, stated that "[i]n accordance with the Department of Justice's internal regulations, a complaint is processed by the bureau in which the complaint arose."  Moreover, McBurrows specifically informed King that "[b]ureaus will forward to the Director of EEO Staff for processing only those cases that pose a real or perceived conflict of interest.   This would include situations where the complaint is filed against members of the EEO Office, officials having supervisory authority over the EEO office [sic] or heads of the bureau."  *Id.*  After this additional correspondence advising King about the process, King would have had to contact an EEO counselor within forty-five days, or by December 8, 2001.  Again, King disregarded this information and attempted to pursue his own method of asserting his retaliation claim.  Specifically, King disregarded two letters which clearly set out the process that he needed to follow.  The first letter clearly stated that King needed to initiate a claim by contacting an EEO counselor, while the second letter stated that only the bureaus will decide whether another agency will handle a real or perceived conflict of interest.  However, King disregarded this advice and did not contact an EEO counselor until after the deadline for doing so had passed.

Further, King has not demonstrated that he is entitled to an equitable tolling of the forty-five day deadline requirement.  King has failed to show that he did not know the proper procedures; conversely, his successful experience filing his initial race discrimination claim belies that argument.  Additionally, King received at least two letters fully detailing the proper procedure but refused to follow the necessary steps.  Even if this Court were to extend the forty-five day requirement from the time King received either of the two aforementioned letters, King failed to properly initiate the process with respect to his indefinite suspension.  King has failed to demonstrate that he was not notified of the time limits or that there were circumstances beyond his control that prevented him

28

from contacting an EEO counselor.

Finally, King argues that his termination on September 6, 2002, is also properly before the Court.  In order to preserve this claim, King must have initiated this claim with an EEO counselor by October 21, 2002.  On September 9, 2002, King wrote a letter to a DEA EEO counselor asking to include his termination as part of his retaliation claim.  However, during his deposition, King testified that by the time he attempted to contact a DEA EEO counselor regarding his retaliation claims, he had already filed the instant Complaint.

Even if the Court were to disregard King's deposition testimony that he failed to contact a DEA EEO counselor regarding his retaliation claims until after he filed his Complaint in federal court, King has failed to exhaust his administrative remedies.  King's letter of September 9, 2002, does not state that he wanted to discuss his termination before filing a formal complaint.  In addition, he did not attempt to schedule a meeting to discuss his termination and he never met with the counselor.  Even more problematic, he never filed a charge with the EEOC based on his termination.  The charge of March 30, 2001, could not have encompassed his termination because he was terminated approximately eighteen months after he attempted to file that charge.  *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period.").  Because King did not file a charge with the EEOC regarding his termination, the EEOC did not have notice of his retaliation claim.  Consequently, the EEOC was not afforded the opportunity to properly investigate and attempt to resolve the dispute.

In March of 2000, King properly followed the administrative procedures required to file a claim for race discrimination, including contacting an EEO counselor, going through the EEO

informal process to attempt to resolve the claims, and then filing a formal charge with the EEOC. However, with respect to King's three specific retaliation claims, King failed to follow the known procedures, including failing to contact a DEA EEO counselor within the forty-five day time period and failing to file a charge with the EEOC for each alleged retaliatory act.  King has not argued that he was unaware of the proper procedures.  In fact, successfully filed his race discrimination claim before any of the alleged retaliatory acts took place.  Even when he was instructed as to the proper procedures, he still chose to pursue his claims through unrecognized channels.

The EEOC must have an opportunity to handle an aggrieved person's claim within its administrative procedure.  29 C.F.R. § 1614.105(d); *Hill v. Potter*, 352 F.3d 1142, 1145-46 (7th Cir. 2003)("Title VII does not authorize the filing of suit until the plaintiff has exhausted his administrative remedies, 42 U.S.C. § 2000e-16(c), which means not until he has received his right-to-sue letter from the EEOC, signifying that the EEOC will not provide him any relief.").  In this case, King was aware of the proper procedures for filing a charge with the EEOC; however, he chose to pursue a different route.  Based on the evidence in the record, King failed to exhaust his administrative remedies and summary judgment is appropriate on his retaliation claims.


## CONCLUSION

Based on the foregoing, King has not demonstrated that a genuine factual issue exists for trial on his claim of race discrimination.  Furthermore, all claims of retaliation are dismissed for failure to exhaust administrative remedies.  Therefore, the Court **GRANTS** the Defendant's Motion for Summary Judgment [DE 28].  The Plaintiff shall take nothing by way of his Complaint and judgment shall be entered on the Complaint in favor of the Defendant.

All remaining settings are **VACATED**.

SO ORDERED this 5th day of May, 2005.

s/ Paul R. Cherry

MAGISTRATE   JUDGE   PAUL   R.   CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record